# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT GREENEVILLE

MICHAEL DAVID FIELDS            )
                                )
        Petitioner,             )
                                )
v.                              )        No.: 2:17-cv-00115-RLJ-CRW
                                )
JAMES HOLLOWAY,                 )
                                )
        Respondent.             )
                                )

## MEMORANDUM OPINION

Petitioner Michael Fields has pro se filed a petition for a writ of habeas corpus under U.S.C. §2254, challenging the constitutionality of his confinement under Sullivan County convictions for reckless homicide, felony murder, especially aggravated robbery, and two counts of especially aggravated burglary [Doc. 2]. After reviewing the parties' filings and the relevant state court record, the Court has determined that Petitioner is not entitled to relief under §2254, and no evidentiary hearing is warranted. *See* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). For the reasons set forth below, the §2254 petition will be **DENIED**, and this matter will be **DISMISSED**.

## I. BACKGROUND

On October 25, 2006, Petitioner was indicted for premeditated murder, felony murder, especially aggravated robbery, and two counts of especially aggravated burglary all related to a 2004 robbery at the Ballis Tourist Home in Kingsport, Tennessee, during which three residents were stabbed, resulting in the death of one resident [Doc. 8-1 p. 3-5]. Two days later, at Petitioner's first court appearance, the assigned criminal court judge, Judge Montgomery, recused himself from Petitioner's case because he had worked in the district attorney general's office at the time of these events. *State*

*v. Fields*, E2011-02485-CCA-R3-CD, 2013 WL 3497648, at *1 (Tenn. Crim. App. July 11, 2013) ("*Fields I*"). The Tennessee Supreme Court ("TSC") then appointed Senior Judge Jon Kerry Blackwood to preside over Petitioner's trial [Doc. 8-1 p. 23], which was ultimately held October 5, 2009. *Id.*

The evidence adduced at Petitioner's trial demonstrated that around lunch time on October 26, 2004, officers responded to a call regarding the Ballis Tourist Home. *Id.* Lieutenant Abernathy of the Kingsport Police Department testified that he was the first to arrive at the scene. *Id.* He entered through the back door of the residence and in the room to his right saw the first victim, who was deceased, covered in blood, and had a large knife wound on the side of her neck.[1] *Id.* at *1-2. He further testified the room was in disarray and that there was a pocketbook open in the room that appeared as if someone had gone through it. *Id.* at *1. He then completed a safety sweep of the residence and confirmed that the assailant left the premises through the back door. *Id.* at *2.

Fred Nuckles, the husband of the deceased victim, testified that he and his wife were in Tennessee and staying at the Ballis Tourist Home during court proceedings related to the custody of their granddaughter. *Id.* Around noon on the day of his wife's murder, he walked to a nearby restaurant, but Mrs. Nuckles stayed behind planning to eat something in the room. *Id.* Upon his return, he fell asleep on the front porch until "one of the boys that run the Ballis home" woke Mr. Nuckles saying that someone in the house had cut him. *Id.* Alarmed, Nuckles ran around the house and re-entered through the back door near his rented room; he found his wife lying in a puddle of blood, noted that his room appeared as if there had been a "big wrestle," and yelled for someone to call an ambulance. *Id.*

---

[1] Later autopsy found that the woman had twenty-five separate stab and cut wounds, made by a "fairly good-size knife," and died from the combination of her wounds which caused her to bleed to death. *Fields I*, 2013 WL 3497648 at *8.

Jack Elbell, another victim, testified that at the time of these events he lived in the Ballis Tourist Home where his brother was the live-in manager. *Id.* at *3. On the day of the crimes, Elbell saw his brother Charles running out of a hallway with blood on his arm and saw a man nearby holding a butcher knife. *Id.* The man demanded money from Elbell and when Elbell reached for it, the man cut the pocket of his pants and took his wallet. *Id.* The man then beat him until he "could feel [himself] going – going out of it." *Id.* Elbell next remembered waking up in the hospital and being told that he had undergone four operations, three on his stomach and one on his throat. *Id.* He had to stay in the hospital for ten days and was sent to rehabilitation for twenty days to learn to walk again. *Id.* At the time of trial, he still had not "fully recovered." *Id.* Elbell described the assailant as around 6'4" and 240 to 250 pounds, but admitted that he was unable to identify the man in police photographs after the incident. *Id.*

Patsy Morales, an administrative assistant at First Baptist Church, which was adjacent to the Ballis Tourist Home, testified that the church had several security cameras outside, one of which was positioned towards the church parking lot between the church and Ballis Tourist Home. *Id.* According to another employee of the church, Chris Ashbrook, visitors to the Ballis Tourist Home frequently parked in this church parking lot. *Id.* at *4. Ms. Morales provided police officers with video recordings from this camera for October 26 and later provided video footage for November 10 as well. *Id.* at *3. Jason Bellamy, a lieutenant from the Kingsport Police Department, testified that after watching the video footage from the day of the crimes numerous times he issued a "be on the lookout" notice, or "BOLO," for a vehicle that was shown in the parking lot. *Id.* at *4.

In addition to the video footage, two church employees testified about the vehicle in the parking lot. Chris Ashbrook, a maintenance supervisor, recalled seeing a dark-colored older model Toyota truck, with primer on it and ladder rack on top, in the parking lot on a few separate occasions and specifically recalled seeing the truck the morning of October 26. *Id.* He identified the driver as an "unshaven white male in his 30s, weighing approximately 200 pounds with dark, bushy hair." *Id.*

3

Angela McInturff who was employed at First Baptist's daycare testified that on October 26, at roughly 11:30 a.m. she left work to run an errand. *Id.* As she walked toward her car, she saw a man walk through the tree line that separated the church parking lot from the residence and that she "had a really bad feeling." *Id.* She said when the man reached the parking lot he began patting his pants "like he had maybe lost his keys." *Id.* His vehicle was an old, black, Toyota truck with pink Bondo over the wheel well on the back driver's side of the truck. *Id.* She said that she was gone for around eight to ten minutes and when she returned, the man was seated in his truck. *Id.* She shared her observation with a co-worker because she had a "really uneasy feeling," and within ten minutes, the daycare was on lock-down due to the events at the Ballis Tourist Home. *Id.*

Thomas Frazier, a life-long acquaintance of Petitioner, testified that he sold Petitioner the described truck, a 1993 Toyota pickup truck, around six months before the crimes.[2] *Id.* at *5. He identified the truck from the photographs taken by the police and indicated that the truck was altered due to damage from a fire. *Id.*

Officer Lawson of the Kingsport Police Department was called to the Ballis Tourist Home to assist in the investigation and recognized the description of the vehicle provided by police as belonging to Petitioner, whom he was familiar with prior to that date. *Id.* at *4-5. He then drove by Petitioner's address, a short distance from the tourist home but Petitioner was not home. *Id.* at *5. He drove by the address "a couple more times" and when he found the truck parked in the driveway, radioed dispatch, after which several detectives responded to the location. *Id.* Detective David Cole with the Kingsport Police Department testified that during the ensuing conversation, officers told Petitioner about the church's surveillance camera. *Id.* at *7.

---

[2] Testimony at trial also indicated that Petitioner had registered a Toyota pickup truck in his name on October 15, 2004. *Id.*

4

Detective Cole also testified that the police confiscated Petitioner's truck on November 9, 2004, processed it for evidence, and drove the truck back to the same parking spot to create comparison video footage to compare with the video footage from October 26, 2004. *Id.* Transparencies were made from these two videos and showed to the jury at trial. *Id.*

Petitioner's ex-wife, Alpha Hamilton, testified that in October 2004, she and her two daughters lived with Petitioner in Kingsport, Tennessee and confirmed that at that time Petitioner drove a Toyota truck purchased from Frazier. *Id.* at *5. During the fall of 2004, she began to notice money missing and "com[ing] up… short" when paying bills. *Id.* When she asked Petitioner about the money, he alternated between admitting and denying that he had taken the money, so she began keeping her money on her person at all times. *Id.* On October 26, 2004, Ms. Hamilton left the house for work at 4:30 a.m. and did not return home until 2:30 p.m.. *Id.* When she arrived home, Petitioner was washing a quilt that was typically kept in the truck for Hamilton's daughters to sit on when they rode in the back of the truck, which to her knowledge had not been washed since it was first put in the truck. *Id.* The clothes that had been in the dryer when she left that morning were sitting in a clothing hamper beside the dryer, although they were still damp. *Id.* When she saw the quilt in the washing machine the next day, she took it out and noticed reddish-brown spots, which Petitioner later told her were chalk stains. *Id.* She had not seen the quilt since that day and when she asked Petitioner where it was, he told her "not to worry about it." *Id.* Hamilton further testified that at some point after October 26, she realized that the floor mats from Petitioner's truck, a pair of Petitioner's jeans, and a pair of Petitioner's tennis shoes were also missing. *Id.* at *6. She never asked Petitioner about the mats but when she asked about the pants and shoes, he told her he did not know what happened to them. *Id.* About a week after the crimes, she also noticed a butcher knife missing from the kitchen.[3] *Id.*

---

[3] Ms. Hamilton's daughter, Jessica Starnes, corroborated that she also had not seen the quilt since the time of the crimes and that a butcher knife was missing from the kitchen knife block. *Id.* at *7.

5

Hamilton testified that prior to October 26, she had taken Petitioner to the Ballis Tourist Home several times to visit his cousin, Larry White, who lived there. *Id.* On several occasions after the murder, she drove past First Baptist Church with Petitioner who was looking for a camera; on one such occasion Petitioner told her that he "didn't think that that camera could get the parking lot."[4] *Id.* Hamilton said that she and Petitioner discussed the murders on several occasions and Petitioner always maintained that he did not know anything. *Id.*

Several months after the murder, Hamilton and Petitioner broke up. *Id.* On the day of the break-up, Hamilton gave a statement to the police in which she indicated that Petitioner "had told her that if police found his DNA, they could not 'do anything' because Petitioner had been to the room before to visit his cousin." *Id.* She testified that she took out an order of protection against Petitioner in January 2005 because she was afraid of him and had filed a complaint against him the day before giving her statement to police. *Id.* She claimed she contacted police because she and Petitioner had argued over his being questioned by police and he told her that "if [she] run [her] mouth and put him away for the rest of his life, that [she] wouldn't have one." *Id.*

Marty Gibson testified that he was introduced to Petitioner in 2004 by Petitioner's cousin Larry White. *Id.* at *7. He testified that in April of 2006, he, White, and Petitioner took a welding job in Wyoming, where they shared a motel room for their month-long stay. *Id.* At some point, the three lost money and Petitioner was very angry and stated, "I'm going to leave my mark on this place. I've already killed one person." *Id.* Another witness, Flint Smith, testified that he became friends with Petitioner during the summer of 2005 while they both lived at the Salvation Army. *Id.* at *8. On one occasion when walking near the Ballis Tourist Home, Petitioner became very nervous and told Smith

---

[4] Ms. Hamilton's daughter, Jessica Starnes, also testified that within the first few days of November as she and Petitioner were driving to the grocery store, Petitioner drove to the church parking lot, pointed at a camera on the side of the church building and said, "how can that camera get me from there?" *Id.* at *7.

6

that he was a suspect in the Ballis Tourist Home murders; he also told Smith that "the lady" was "accidentally stabbed," "I accidentally done that." *Id.* Smith did not ask further questions, although he did approach police about this conversation after being charged for unrelated crimes; officers then unsuccessfully attempted to use Smith to prompt Petitioner to further discuss the crimes. *Id.*

In his defense, Petitioner presented evidence that he was in Yuma, Virginia, during both the morning and afternoon hours of October 26, 2004. *Id.* at *9. Petitioner's cousin Larry White testified that Petitioner was at his residence in Yuma, which was testified to be 6.6 miles or around twelve minutes from the Ballis Tourist Home, early in the morning and remained there after White left the home around 10 or 11 a.m.. *Id.* Margaret Roberts, a long-time acquaintance of Petitioner's, testified that he came to her workplace between 1:00 and 1:30 p.m. that day. *Id.*

On October 8, 2009, the jury convicted Petitioner of felony murder, reckless homicide, especially aggravated robbery, and two counts of especially aggravated burglary [Doc. 8-19 p. 144-46]. The trial court merged Petitioner's reckless homicide conviction into his felony murder conviction and imposed a mandatory life sentence [Doc. 8-22 p. 15-18]. It additionally sentenced Petitioner to twenty-year sentences for each count of especially aggravated burglary and especially aggravated robbery [*Id.*]. The burglary sentences were to be served concurrently to each other but consecutively with the robbery sentence for a total effective sentence of life plus forty years [*Id.*]. On April 7, 2010, Petitioner filed a motion for new trial [Doc. 8-23], which was denied after a hearing [*Id.* at 6]. Petitioner then filed an appeal to the Tennessee Court of Criminal Appeals ("TCCA") alleging that his right to speedy trial was violated [Doc. 8-25]. The TCCA affirmed the judgment of the lower court, finding that while there was a three-year delay between Petitioner's indictment and his charges, Petitioner had not established "a meritorious claim for a speedy trial violation" [Doc. 8-27]. Petitioner applied for permission to appeal to this judgment to the Tennessee Supreme Court ("TSC") [Doc. 8-28] which was denied [Doc. 8-29].

Petitioner then pro se filed a petition for post-conviction relief in state court raising various grounds of judicial misconduct, prosecutorial misconduct, and ineffective assistance of counsel, along with a motion to appoint counsel [Doc. 8-30 p. 3-22]. After appointment, counsel filed an amended petition raising many grounds of prosecutorial misconduct, judicial misconduct, and ineffective assistance of counsel relating to the use of the transparencies at trial, a *Brady* violation, and various claims of ineffective assistance of counsel [*Id.* at 40-68]. The court denied Petitioner post-conviction relief [Doc. 8-31 p. 2-27]. Petitioner appealed to the TCCA [Doc. 8-41], which was likewise denied [Doc. 8-43]. Petitioner applied for permission to appeal to the TSC [Doc. 8-44], which was likewise denied [Doc. 8-45].

Finally, Petitioner filed the instant petition for a writ of habeas corpus [Doc. 2]. After the State filed its response [Doc. 10], Petitioner filed several motions for extension of time to file his reply [Docs. 11, 13, 15, 19], but never filed a reply. This matter is now ripe for review.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. §2254, prohibits the grant of habeas corpus relief for any claim that a state court adjudicated on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1) and (2). This standard is intentionally difficult to meet. *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quotation marks omitted). A district court may only grant habeas relief under the "contrary to" clause where the state court decides a question of law or materially indistinguishable set of facts conversely to the Supreme Court. *Williams v. Taylor*, 529 U.S. 362,

405-06 (2000). Under the unreasonable application clause, a district court analyzes whether the state court applied the correct legal principle in an "objectively unreasonable" manner; it is not enough that the state court's decision was simply erroneous or incorrect. *Id.* at 409 – 11; *Schriro*, 550 U.S. at 473. The AEDPA likewise requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). Where the record supports the state court's findings of fact, those findings are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In addition to the stringent standard for succeeding on the merits of a claim, the grant of habeas relief is further restrained by exhaustion requirements and the doctrine of procedural default. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In order for a claim to be considered on habeas review, the petitioner must first exhaust state remedies for that claim. 28 U.S.C. §2254(b)(1). Exhaustion requires a petitioner to "fairly present," each federal claim to all levels of the state appellate system, meaning he presented the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's claims," *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990); *see O'Sullivan*, 526 U.S. at 842. Tennessee has determined that presentation to the TCCA will satisfy the requirement of presentation to the state's highest court. Tenn. S. Ct. R. 39. If a claim has never been presented to the highest available state court and is now barred from such presentation by a state procedural rule, that claim is procedurally defaulted and barred from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Procedural default may also occur when a petitioner presented the claim to the highest court but the state court was prevented from "reaching the merits of the petitioner's claim" because petitioner failed to comply with an applicable state procedural

rule, which is regularly enforced and is an "adequate and independent" state ground. *Id.* (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977)).

A claim that has been procedurally defaulted may be considered on its merits only if the petitioner establishes cause for his failure to comply with the state procedural rule and actual prejudice from the alleged violation or demonstrates that his is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); s*ee also House v. Bell*, 547 U.S. 518, 536 (2006). Where petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). To successfully warrant review under the "actual innocence" prong, which is reserved for fundamental miscarriages of justice, a habeas petitioner must demonstrate that in light of new, reliable evidence – either eyewitness accounts, physical evidence, or exculpatory scientific evidence – that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *House,* 547 U.S. 518, 536 (2006) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

### III. ANALYSIS

In the instant petition, Petitioner raises the following claims, as paraphrased by the Court:

    A. Petitioner's right to fair and speedy trial were violated when:

        i. There were repeated delays between his indictment and trial; and

        ii. An impartial judge participated in the scheduling of Petitioner's trial.

    B. Petitioner received ineffective assistance of trial counsel when:

        i. Counsel failed to introduce an exculpatory video from AmSouth Bank;

ii. Counsel failed to request a change of venue;

iii. Counsel failed to call an expert witness regarding the transparencies;

iv. The post-conviction court erroneously dismissed allegations of judicial and prosecutorial misconduct regarding the transparencies and counsel failed to request curative instructions; and

v. Counsel failed to raise all issues presented in the motion for new trial on Direct Appeal.

vi. Petitioner is entitled to relief due to the cumulative effect of the errors by trial and appellate counsel.

C. Petitioner received ineffective assistance of post-conviction counsel when post-conviction counsel failed to raise the following issues:

i. Trial counsel was ineffective for failing to call eye-witness Charles Elbell;

ii. Trial counsel failed to file a motion to strike/or request voir dire for a biased juror; and

iii. Trial counsel failed to adequately investigate state witness Marty Darryl Gibson.

[Doc. 2]. Each of these will be discussed in turn.

### A. Fair and Speedy Trial

#### 1. Trial delays

Petitioner contends that the nearly three years between his indictment and trial was an unreasonable delay, caused by gross negligence and the prosecution's attempt to gain a tactical advantage over the defense, which thus violated his right to speedy trial [Doc. 2 p. 5-6]. He alleges that the delay prejudiced his defense because it caused defense evidence to go "stale," as the one

11

witness who could have given Petitioner an alibi for the time of the murder died in the interim [*Id.*]. Respondent contends instead that the delays were either acquiesced to by Petitioner or were required to fairly prosecute Petitioner and thus did not violate his constitutional right to a speedy trial [Doc. 10 p. 23-27]. The Court finds that the TCCA's holding was neither contrary to nor an unreasonable application of clearly established federal law.

Petitioner was indicted on October 25, 2006 and stood trial on October 5, 2009, nearly three years later. *Fields I*, 2013 WL 3497648, at *10. He first alleged a violation of his right to speedy trial on Direct Appeal [Doc. 8-25]. There, the TCCA applied *Doggett v. United States*, 505 U.S. 647, 654 (1992) and *Barker v. Wingo*, 407 U.S. 514 (1972) to find that Petitioner's right to speedy trial was not violated. *Id.* Under *Barker*, 407 U.S. at 530, the court looked to (1) the length of the delay, (2) the reason for the delay, (3) whether Petitioner asserted his right to a speedy trial, and (4) whether Petitioner was prejudiced. *Id.* The court determined that while a nearly three-year delay was sufficient to trigger an inquiry into Petitioner's speedy trial rights, it was not in and of itself an excessive delay in light of other cases. *Id.*

Under factor (2), the court analyzed the reasons for the delay at each stage of Petitioner's pre-trial hearings. *Id.* At Petitioner's first hearing after arraignment, the trial court suggested a trial date of April 2008 and Petitioner's counsel requested a later date due to another case he had set in April. *Id.* at *11. The trial was then set for July 7, 2008. *Id.* In June of 2008, the State requested a continuance because another trial had been delayed to the same date as Petitioner's trial. *Id.* Although counsel voiced concern over Petitioner's later 2006 charges being tried before his 2004 charges, the trial court and defense counsel agreed that scheduling conflicts for each of them necessitated trying the 2006 case first. *Id.* Trial was reset for February 2, 2009. *Id.* In December of 2008, due to a motion to have Petitioner evaluated for competency in the 2006 case,

which could have necessitated incompetency in the 2004 case as well, the trial court reset Petitioner's trial to July 20, 2009. *Id.* Finally on June 15, 2009, the State moved for a continuance because key witness Detective Cole had surgery. *Id.* at *12. Counsel did not object and trial was set for October 5, 2009. *Id.* The TCCA found that these delays were either acquiesced to or caused by Petitioner and that there was no evidence that the delays were executed in order to gain a tactical advantage, which then weighed against Petitioner. *Id.* It likewise found that factors (3) and (4) weighed against Petitioner as he did not assert his right to a speedy trial and the prejudice against him – the death of his father, whose prior testimony did not unequivocally negate Petitioner's presence at the tourist home at the time of the murders – was minimal. *Id.* The court thus found that Petitioner's right to a speedy trial was not violated. *Id.*

In order to determine if Petitioner's Sixth Amendment right to speedy trial was violated, the Court must look to: (1) the length of the delay; (2) the reason for the delay; (3) whether Petitioner asserted his right; and (4) whether Petitioner was prejudiced by the delay. *Barker*, 407 U.S. at 530. Neither of these factors is independently necessary nor sufficient to establish a speedy trial violation, but rather they should be considered together along with other relevant circumstances. *Id.* at 533.

The Court cannot find that the TCCA's holding was contrary to or an unreasonable application of clearly established federal law. The court correctly identified the relevant precedent and reasonably applied the factors to the facts in this case. Although the delay between indictment and trial was lengthy, the record demonstrates that the delay was caused by reasonable, routine concerns, that Petitioner did not assert his right to a speedy trial, and that Petitioner was only nominally prejudiced by the delay. Petitioner is therefore not entitled to relief.

13

## 2. Impartial Judge

Petitioner further alleges that his right to a fair and speedy trial were violated because Judge Montgomery, who Petitioner claims recused himself from trying the 2004 charges in order to try Petitioner's 2006 charges, participated in the scheduling of the instant case and engaged in improper communications with the judge who was later assigned to the case [Doc. 2 p. 6-7]. Specifically, he claims that Judge Montgomery's "openly expressed desire" to try the 2006 charges first demonstrated his impartiality and that even post-recusal Judge Montgomery continued attempting to influence the trial date for Petitioner's 2004 charges [*Id.*]. Respondent holds out that Petitioner completely fails to present any supporting evidence for this claim and thereby fails to sufficiently undermine the TCCA's factual finding [Doc. 10 p. 28]. The Court finds that because Petitioner has introduced no evidence and there is none in the record, the TCCA's factual finding must stand under the AEDPA.

At Petitioner's first court appearance, Judge Montgomery, recused himself noting that he did so because he worked in the attorney general's office at the time of these crimes and had knowledge that could impair his ability to try the case [Doc. 8-2 p.11]. At that hearing, the parties disagreed on how to handle Petitioner's two separate cases and which order they should be tried, with defense counsel arguing that the charges from 2004 should be tried first [*Id.* at 3]. Judge Montgomery decided to "reset [the 2004 case] to the 1st and let [Judge Cupp] decide what he wants to do and you all can deal with that with him," and then scheduled the trial for Petitioner's 2006 case for July 9, 2007 [*Id.* at 4-5]. At Petitioner's arraignment in the 2004 case, Judge Cupp noted that "this case is not going to move until after Judge Montgomery gets rid of the other one" [Doc. 8-3 p. 4]. When asked if he had agreed to take the case, Judge Cupp said "[y]es, he asked me but I'm simply not going to hear it until you all try the other one. I'm going ---- I'm not even

14

going to set it back on the docket anymore until you try the other one" [*Id.* at 5]. After Petitioner was brought into the courtroom, Judge Cupp stated that "Judge Montgomery did talk to me about this case yesterday," and that he was not setting the matter for trial until Petitioner's other case was heard as a concession to defense counsel's schedule [*Id.* at 6]. Later, Judge Cupp withdrew himself and Judge Jon K. Blackwood was assigned to Petitioner's case to set a trial date and hear Petitioner's case [Doc. 8-5 p. 3]. The Court is aware of no other mention in the record of Judge Montgomery or Judge Cupp's participation in Petitioner's trial.

The TCCA found that there was no evidence to support that Judge Montgomery engaged in improper communication with the judges who were later assigned to Petitioner's case. *Fields I*, at *13. Under the AEDPA, as long as supported by the record, a state court's factual findings are entitled to a presumption of correctness which may only be rebutted by clear and convincing evidence. U.S.C. 2254(e)(1). Although the record reflects that Judge Montgomery asked Judge Cupp to take the case, Petitioner has cited to nothing in the record indicating *improper* communication with Judge Cupp or that Judge Montgomery ever discussed the trial date with Judge Blackwood, who actually determined Petitioner's trial date in this case. Petitioner has not offered clear and convincing evidence to thwart the TCCA's factual finding and is not entitled to relief.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner raises several claims that his counsel was constitutionally ineffective in violation of his "Fifth, Sixth, and Fourteenth Amendment[]" rights, which Respondent contends are without merit. The Sixth Amendment entitles criminal defendants to the "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To successfully prove that counsel was constitutionally ineffective, a defendant must establish: (1) that counsel's

15

performance was deficient such that he was no longer "functioning as the 'counsel' guaranteed under the Sixth Amendment," and (2) that counsel's "performance prejudiced the defense . . . so as to deprive the defendant of a fair trial" and undermine the reliability of trial results. *Strickland*, 466 U.S. at 687. To prove deficiency, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. To prove prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The Court should be deferential to counsel's performance and afford counsel a presumption that his actions were a result of "sound trial strategy." *Id.* at 689.

### 1. AmSouth Bank

Petitioner first alleges that counsel was ineffective for failing to introduce security camera footage from AM South Bank which would have contradicted Petitioner's presence at the crime scene [Doc. 2 p. 8-9]. While Petitioner concedes that this was a tactical decision by counsel, he argues both that counsel should have discussed this decision with him prior to trial and that the decision was based on an inadequate investigation into potential defense options [*Id.*]. Respondent holds out that the video was not probative as it did not show Petitioner or his vehicle and did not directly contradict the State's timeline, thus the TCCA was not unreasonable in finding that trial counsel made a reasonable strategic decision to not introduce the video [Doc. 10 p. 32-34]. The Court finds that the TCCA's holding that counsel was not ineffective is neither an unreasonable application of nor contrary to federal law.

Video footage for the date of the murders was obtained from a security camera at AmSouth bank, which was located on the main road between the Ballis Tourist Home and Yuma, Virginia, showing the vehicles passing the bank. *Fields v. State*, E2015-01850-CCA-R3-PC, 2016 WL

5543259, at *7 (Tenn. Crim. App. Sept., 29, 2016) ("*Fields II*"). The video captured a fifteen-minute period between 12:15 and 12:30 and the parties agreed that it did not show Petitioner or his vehicle. *Id.* In his post-conviction appeal, Petitioner argued that the video was "favorable to him because it conflict[ed] with the State's timeline of the murder," and that trial counsel was ineffective for failing to introduce it. *Id.* However, trial counsel testified at post-conviction hearings that the video had no probative value. *Id.* The TCCA applied *Strickland* and found that counsel was not ineffective as the video lacked probative value. *Id.* at *8. The court noted that the timeline provided at trial indicated that the crime occurred between 11:50 and 12:00 and while Petitioner presented witnesses who placed him in Yuma, Virginia around 11:00 in the morning and around 1:00 to 1:30 p.m., Petitioner conceded that no witness placed him in or traveling to Yuma during the time of the offenses. *Id.* Accordingly, the TCCA then found that the video lacked probative value because it neither showed Petitioner nor supported Petitioner's alibi and Petitioner thus showed neither defect nor prejudice. *Id.*

The TCCA both correctly identified *Strickland* as applying to ineffective assistance of counsel claims and reasonably applied its standards. Strategic decisions regarding trial tactics made "after thorough investigation of law and facts," are "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* Although Petitioner contends that trial counsel based his decision off of an inadequate investigation, Petitioner does not indicate in what way counsel's investigation into the video was deficient, except to say that counsel should have conferred with him "to elicit matters of defense," and "ascertain that potential defenses are available" [Doc. 2 p. 8]. The TCCA credited counsel's testimony that he was aware of the video but decided not to introduce it based on his

17

view that the video was not probative. The Court finds that neither counsel nor the TCCA was unreasonable for this decision, given that the video bore no impact on Petitioner's defense. Petitioner is not entitled to relief.

### 2. Change of Venue

Petitioner argues that counsel was ineffective for failing to request a change of venue because the murder was heavily covered by the media in Kingsport, TN which prejudiced the jury and Petitioner's trial [Doc. 2 p. 9-10]. Respondent, however, holds out that counsel made a reasonable, strategic decision where he believed that a change in venue could relegate Petitioner to a less-favorable jury and that Petitioner has not demonstrated actual prejudice [Doc. 10 p. 34-36]. The Court agrees with Respondent.

At post-conviction hearings, trial counsel testified that it was general practice in Sullivan County to request a change in venue only after determining that counsel was unable to pick a fair and impartial jury in Sullivan County. *Fields II*, 2016 WL 5543259, at *6. He further testified that "in his experience the alternative venue was usually a more rural East Tennessee county, and he did not think that the Petitioner would draw a more favorable jury in such a county." *Id.* The TCCA applied state law to show that while a change in venue can be granted "upon a showing of undue excitement," counsel will not be ineffective for failing to request a change in venue "absent a showing of prejudice." *Id.* (citing Tenn. R. Crim. P. 21; *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994)). The TCCA found that the trial court "conducted a 'slow and deliberate' voir dire" and credited counsel's testimony that he "was able to select a jury he felt was fair and impartial from the first panel, [so] he decided not to seek a change in venue." *Id.* The court declined to second-guess counsel's strategy and noted that although Petitioner mentioned media

attention, he "failed to introduce any evidence that this attention was prejudicial to his defense." *Id.*

The state court made a factual finding that Petitioner had not introduced any evidence of prejudice, which is presumed to be correct absent clear and convincing evidence to the contrary. 28 U.S.C. §2254(e)(1). Petitioner has not offered evidence that he was actually prejudiced by counsel's decision not to seek a change in venue and the Court cannot then find that the state court was unreasonable in determining that counsel was not ineffective. *See Holt v. Carlton*, 2008 U.S. Dist. LEXIS 19436, at *21-22 (E.D. TN., Mar. 12, 2008) (holding that counsel was not ineffective when Petitioner offered no evidence of prejudice related to counsel's decision not to seek a change in venue); *McCurry v. Mills*, 2009 U.S. Dist. LEXIS 80322, at *34 (E.D. TN., Aug. 31, 2009) (holding that counsel was not ineffective for failing to request a change of venue where the "parties were able to seat a jury who swore on their oath that they could try the case fairly.")

### 3. Expert Witness

Petitioner alleges that trial counsel was ineffective for failing to present the expert testimony of Primus Tilman, who had previously opined that the transparencies made from the First Baptist Church security camera footage were not sufficiently detailed to be useful in identifying Petitioner's truck [Doc. 2 p. 10-12]. Respondent holds out that counsel made a strategic decision to omit this testimony as he did not believe it was particularly useful and could have opened the door to harmful rebuttal [Doc. 10 p. 36-39]. The Court finds that the TCCA's holding that trial counsel made a strategic decision and was not ineffective was not an unreasonable application of federal law.

Transparencies were made from the security camera footage from First Baptist Church. The first was made from the October 26 video footage, the date of the crimes, showing a vehicle

believed to belong to the assailant parked in the parking lot between the church and the tourist home [Doc. 8-7 p. 11-12].  The second transparency showed a crime-scene recreation where officers parked Petitioner's truck, which had been seized, in the same parking space the assailant's vehicle had been parked before [*Id.*].  Defense counsel filed a motion to exclude the use of the transparencies at trial and although the trial court's order on this matter is confusing, it appears that the trial court determined that the transparencies could be introduced, but that Detective Cole, who created the transparencies, would not be able to testify as an expert regarding them.  *Fields II*, 2016 WL 5543259, at *2.  Later, the court ruled that if counsel could find "an expert to cast doubt upon the reliability of the second transparency" the court would hear such argument [Doc. 8-7 p. 21].  At a later suppression hearing regarding the transparencies, counsel called Professor Tilman to testify [Doc. 8-12].  Professor Tilman testified that in his expert opinion the transparencies could not be sufficiently enhanced to positively identify the two vehicles as being the same [Doc. 8-12 p. 10-11].  The court still ruled that the transparencies could be admitted [*Id.*].  Professor Tilman was not called at trial.

On post-conviction, Petitioner challenged counsel's failure to call Professor Tilman but did not present Professor Tilman at post-conviction hearings.  *Fields II,* 2016 WL 5543259, at *7.  However, he did submit Professor Tilman's earlier testimony as an exhibit.  *Id.*  Trial counsel testified at post-conviction hearings that he did not present this testimony because he did not think the jury would find it persuasive.  *Id.*  He stated:

> From what I heard at the [suppression] hearing, my considered conclusion was: This is not an issue that we can bring up at trial, you know.  [Tilman] is not going to be able to persuade these folks not to believe their own eyes.  I saw no benefit in [calling Tilman as a witness].  We'd raised the issue.  We objected to it.  We filed motions, apparently and briefs, and motions to reconsider in litigating the issue.

*Id.* He also testified that he was worried presenting Professor Tilman could open the door to a State rebuttal expert witness, who had previously been excluded, which could have been extremely detrimental to Petitioner's case. *Id.* Based on this testimony and a review of the transcript of the suppression hearing, the TCCA applied *Strickland* and upheld the post-conviction trial court's decision that "trial counsel made a well-reasoned strategic decision not to call Professor Tilman." *Id.*

To demonstrate that counsel was ineffective for failing to call a particular witness, Petitioner must show that the witness had favorable information and the lack of that witness's testimony prejudiced his defense. *Pillette v. Berghuis*, 408 F. App'x. 873 (6th Cir. 2010) (citing *Towns v. Smith*, 395 F.3d 251, 258-60 (6th Cir. 2005)). However, "defense counsel had no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004). Moreover, defense counsel is not deficient for failing to use expert testimony, even if that testimony may have been useful, when counsel had a reasonable, strategic reason for not doing so. *Harrington v. Richter*, 562 U.S. 86, 89 (2011) (noting that even if the value of expert testimony had been apparent, counsel's decision to omit such testimony may be reasonable where the testimony could have opened the door to rebuttal expert testimony or distracted the jury).

The Court cannot find that the TCCA's holding was contrary to or based on an unreasonable application of federal law. Trial counsel was not deficient for failing to present a witness that would not have materially aided the defense, particularly where he had strategic reasons for doing so. The TCCA credited counsel's testimony that after the trial court's ruling, (1) counsel believed that Professor Tilman's testimony was not particularly useful, as it was unlikely to make the jury doubt what they could see themselves, (2) counsel was afraid the testimony could

21

open the door to an otherwise excluded rebuttal witness, and (3) he thought the testimony was the kind of scientific testimony useful to a judge but not a jury. Given the court's ruling, it is unclear whether Professor Tilman had information which was useful to the jury and his testimony created other potential issues for the defense in that it may have confused the jury or opened the door to rebuttal testimony. Petitioner has offered no argument that counsel's decision was outside of the bounds of professional competence, nor has he demonstrated that but for counsel's error in failing to call Professor Tilman that there is a reasonable probability that the result of the proceedings would have been different. Petitioner is not then entitled to relief.

### 4. Judicial and Prosecutorial Misconduct and Curative Instructions

Petitioner's next ineffective assistance of counsel claim alleges that the post-conviction court erred by dismissing grounds of judicial misconduct and prosecutorial misconduct related to the use of the transparencies for identification at trial and the trial court's lack of curative instruction [Doc. 2 p. 12-13]. He likewise claims that trial counsel was ineffective for failing to request jury instructions regarding the use of the transparencies as identification and regarding the "prosecutor['s] violation of due process under *Brady*."[5] Respondent alleges that Petitioner's claim that trial counsel was ineffective for failing to request jury instructions is procedurally defaulted [Doc. 10 p. 39-44]. Specifically, Respondent contends that while Petitioner raised this claim on a theory of judicial and prosecutorial misconduct below, and challenged counsel's lack of objection to the State's closing argument, he did not raise a claim that counsel was ineffective for failing to request a curative instruction [*Id.*]. The Court agrees with Respondent, Petitioner's claim is procedurally defaulted.

---

[5] Petitioner's claim is inartfully pleaded, but it appears that he raises these claims only as a sub-claim of ineffective assistance of counsel, not standalone claims of prosecutorial misconduct and judicial misconduct.

In his state court post-conviction petition, Petitioner argued that the prosecutor committed misconduct during closing arguments when he posed that the jury could infer that the truck in each transparency belonged to Petitioner, that the trial court committed judicial misconduct by failing to issue a curative instruction in response to the prosecutor's statement, and that trial counsel was ineffective for failing to object to the prosecutor's statement [Doc. 8-30 p. 50-53]. The post-conviction court ultimately found that each of these issues was without merit [Doc. 8-31]. Petitioner next appealed to the TCCA, including each of the above issues in his appellate brief [Doc. 8-41]. The TCCA held that it would address each contention in turn, but noted that "both at the post-conviction hearing and in his brief to this court, the Petitioner conceded that his arguments regarding judicial and prosecutorial misconduct revolve around the introduction of the transparencies at trial and counsel's failure to object to the same," and thus determined that it would analyze these claims under the framework of ineffective assistance of counsel [Doc. 8-43]. The TCCA held that Petitioner had not proved prosecutorial misconduct, as it was not error for the State to comment on inferences the jury may make regarding the transparencies, which then thwarted Petitioner's ineffective assistance of counsel and judicial misconduct claims [*Id.*].

To be fairly presented, and thus avoid procedural default, a Petitioner must present the same claim under the same theory that it was presented to the state courts. *Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004); *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (ineffective assistance of counsel claim that "rests on a theory which is separate and distinct from the one previously considered and rejected in state court," is procedurally defaulted). Petitioner's claims here and below are inartfully pleaded and amorphous. Here, under a broad heading of "Ground 2 – ineffective assistance of counsel," Petitioner characterized his argument as "whether the post-conviction court erred in dismissing grounds of judicial misconduct and prosecutorial

misconduct" and whether counsel erred in failing to request a jury instruction regarding the transparencies [Doc. 2 p. 12-13]. It is unclear how judicial misconduct or prosecutorial misconduct render counsel ineffective, other than counsel's failure to object to those issues. However, the claim Petitioner now raises regarding counsel's lack of objection is that counsel failed to request a curative instruction, not that counsel failed to object to the State's closing argument, which is what he raised below. Thus, this claim is procedurally defaulted.

Alternatively, the Court finds that even if this claim were not procedurally defaulted, it would not entitle Petitioner to habeas relief. *See* 28 U.S.C. § 2254(b)(2) (providing court may deny claim on merits notwithstanding failure to exhaust). The TCCA rejected this claim finding that because the trial court admitted the transparencies "leaving the jury to draw their own conclusions," it was not then error for the State to "comment or state inferences [that] the jury could or should draw from the evidence," that counsel was not then ineffective for failing to object to the State's closing arguments, and the trial court did not commit judicial misconduct for failing to issue a curative instruction regarding the prosecutor's comments. *Fields II*, 2016 WL 5543259, at \*6. The TCCA's holding that counsel was not ineffective for failing to object to the State's closing argument is not objectively unreasonable, nor would Petitioner be entitled to relief on the claim that counsel should have requested a curative instruction. The trial court determined that ultimately what the transparencies showed was a question for the jury; both parties were certainly then permitted to comment on what inferences they hoped the jury may draw. Moreover, "to prevail on a claim of ineffective assistance for counsel's failure to request a curative instruction, a petitioner would need to show prejudice by demonstrating a reasonable probability that the omission of such instruction affected the outcome of the trial." *See Gann v. Lester*, 4:13-CV-71-HSM-CHS, 2016 WL 4690399, at \*32 (E.D. TN. , 2016) (citing *Shafer v. Wilson*, 364 F. App'x

940, 951 (6th Cir. 2010) (finding no prejudice "given the unlikelihood that the omission of such instruction affected the outcome of the trial")). Petitioner has not demonstrated that in light of the other evidence of his guilt, and indeed other evidence that Petitioner's truck was at the Ballis Tourist home the day of the murders, that he was prejudiced by counsel's failure to request a curative instruction. He is not entitled to relief on this claim.

### 5. Motion for New Trial

Petitioner alleges that counsel was ineffective for failing to raise each of the issues raised in his Motion for New Trial on Direct Appeal [Doc. 2 p. 13-15]. Respondent challenges however that this claim is procedurally defaulted because Petitioner failed to comply with a regularly enforced state procedural rule [Doc. 10 p. 44-47]. The Court finds that this claim is procedurally defaulted.

In Petitioner's Motion for New Trial, filed by counsel, Petitioner raised eight issues [Doc. 8-1 p. 146-150]. On Direct Appeal, counsel raised only that Petitioner's right to speedy trial was violated [Doc. 8-25]. On post-conviction, Petitioner challenged that counsel was ineffective for failing to raise all of the issues from the motion for new trial on appeal [Doc. 8-30 p. 3-22; p. 40-67]. At post-conviction hearings, counsel testified that he "only raised the speedy trial issue because he felt it was the Petitioner's strongest argument, and he did not want to detract from the strength of that argument by including other, less viable, grounds for relief." *Fields II,* 2016 WL 5543259, at *10. On post-conviction appeal, the TCCA first found that these claims were waived because petitioner failed to "support his claim with argument or supporting authority," according to Tenn. R Crim. P. 10(b) and Tenn. R. App. P. 27(a)(7). *Id.* at *9. However, the TCCA also noted that the record did not preponderate against the post-conviction court's finding that counsel

was not ineffective. *Id.* at *10. The court found that it would not second-guess counsel's decision and that Petitioner was not entitled to relief. *Id.*

A claim may be procedurally defaulted when Petitioner fails to comply with a state procedural rule, which is an adequate and independent, regularly-enforced state rule. *Coleman*, 501 U.S. at 732. Here, the TCCA found that Petitioner failed to comply with Tenn. R. App. P. 27(a)(7) and Tenn. R. Crim. P. 10(b) and thus waived these claims, when he failed to specify or in any way develop the claims he says should have been raised or present argument demonstrating that those claims would have been successful if presented. *Fields II*, 2016 WL 5543259, at *10. This rule is regularly-enforced in Tennessee courts. *See State v. Willis*, 496 S.W.3d 653, 716 (Tenn. 2016); *see also Middlebrooks v. Carpenter*, 843 F.2d 1127, 1136 (6th Cir. 2016) (concluding that a claim was procedurally defaulted where petitioner did not comply with Tenn. Ct. Crim. App. R. 10(b) and Tenn. R. App. P. 27(a)(7)). As such, these claims are procedurally barred before this Court.

### 6. Cumulative Effect

Petitioner alleges that counsel was ineffective due to the cumulative effects of his errors at trial and on appeal [Doc. 2 p. 15-16]. Respondent argues first that the cumulative impact of errors is not a cognizable claim for relief in a federal habeas petition and second, that Petitioner is not entitled to relief where each of his individual claims of ineffective assistance of counsel are meritless [Doc. 10 p. 47-48]. The Court agrees with Respondent.

First, "[t]he Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002) (citing *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002)). Moreover, "because the individual claims are all essentially meritless, [Petitioner] cannot show

26

that the cumulative error[s] violated his constitutional rights." *Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006) (citing *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)). Accordingly, Petitioner is not entitled to relief on this claim.

### C. Ineffective Assistance of Post-Conviction Counsel Claims

Petitioner argues that his post-conviction counsel was ineffective for failing to raise three instances of the ineffective assistance trial counsel [Doc. 2 p. 16-20]. Specifically, he claims that trial counsel: (1) failed to call victim Charles Elbell as a witness; (2) failed to file a motion to strike or conduct an individual voir dire of a potentially biased juror; and (3) failed to conduct an adequate investigation into state witness, Marty Darryl Gibson [*Id.*]. The parties agree that these claims were either not raised or were improperly raised to the TCCA and are thereby procedurally defaulted [*Id.*; Doc. 10 p. 48-54]. *See Coleman*, 501 U.S. at 732. However, Petitioner argues that he can present cause and prejudice sufficient to warrant an exception to the rules of procedural default.

When a claim has been procedurally defaulted, it may still be entitled to merits review only where Petitioner can adequately demonstrate cause and prejudice. *Murray*, 477 U.S. at 496. "Cause" requires a petitioner to show that some objective external factor impeded counsel's ability to raise the claim or comply with state procedural rules. *Coleman*, 501 U.S. at 753. "Prejudice" requires Petitioner to demonstrate that the errors "worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions," not just that that prejudice was possible. *United States v. Frady*, 456 U.S. 152, 170 (1982).

Here, Petitioner argues as cause the ineffective assistance of post-conviction counsel under the *Martinez/Trevino* framework.[6]  Ordinarily, there is "no constitutional right to an attorney in state post-conviction proceedings," so the ineffective assistance of counsel in post-conviction proceedings does not qualify as "cause" to excuse procedural default of constitutional claims. *Coleman*, 501 U.S. at 755.  However, the Supreme Court has carved out a narrow exception allowing the ineffective assistance of post-conviction counsel to constitute cause for defaulted claims of ineffective assistance of counsel when those claims may be raised for the first time in post-conviction proceedings or "where a state procedural framework… makes it highly unlikely… that a defendant [had] a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013) (citing *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012)).  This exception applies in Tennessee. *See Sutton v. Carpenter*, 745 F.3d 787, 795-96 (6th Cir. 2014).

In order to warrant review under the *Martinez/Trevino* framework, the Court must find that: (1) Petitioner's claims of ineffective assistance of trial counsel were "substantial," (2) there was no counsel or counsel was ineffective during the state collateral review, (3) the state collateral review proceeding was the "initial" review proceeding, and (4) the state-law system requires or strongly encourages ineffective assistance claims to be raised in initial-review collateral proceedings. *Trevino*, 569 U.S. at 423 (citing *Martinez*, 566 U.S. at 13-14, 16-17).  Accordingly, to successfully raise an ineffective assistance of trial counsel claim under *Martinez*, a petitioner

---

[6] While Petitioner appears to present, or at least categorize, these claims as standalone claims of the ineffective assistance of post-conviction counsel, such claims would be procedurally defaulted and as shown below, *Martinez* and *Trevino* would not apply to constitute cause for these claims.  The Court assumes then that Petitioner's intention is to present the ineffective assistance of post-conviction counsel as cause for which to excuse the procedural default of his ineffective assistance of counsel claims.

must show both that his post-conviction counsel was ineffective and that his underlying ineffective assistance of trial counsel claims were substantial. *Woolbright v. Crews*, 791 F.3d 628, 637 (6th Cir. 2015). Respondent challenges that Petitioner's three procedurally defaulted claims are not substantial and are thus not entitled to review [Doc. 10 p. 48-51].

To demonstrate that his claims are substantial, Petitioner "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 566 U.S. at 14, which requires analysis under the conjunctive deficiency and prejudice test set out by *Strickland*, 466 U.S. at 687. Each of Petitioner's defaulted claims will be discussed in turn.

### 1. Charles Elbell

Petitioner claims that trial counsel was ineffective for failing to call victim Charles Elbell as a witness at trial, who Petitioner contends would have been a favorable defense witness because he was unable to identify Petitioner during photographic line-ups and had previously identified another individual as his assailant [Doc. 2 p. 16-17]. Although Petitioner challenged this in his pro se post-conviction brief [Doc. 8-30 p. 15], counsel did not include it in his amended petition [*Id.* at 40-67]. At post-conviction hearings, however, trial counsel testified that he did not call Mr. Elbell both because Mr. Elbell could not identify his assailant and was likely to be a very sympathetic victim due to his age and infirmity, which meant that his testimony carried risks but had little value [Doc. 8-32 p. 134-36].

To determine if counsel was ineffective for failing to call a witness, Petitioner must establish that a witness had favorable information and the lack of that witness's testimony prejudiced his defense. *Pillette*, 408 F. App'x. at 884 (citing *Towns*, 395 F.3d at 258-60). However, "defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender*, 376 F.3d at 527.

29

Although Mr. Elbell could not identify Petitioner from a photographic lineup, he did later identify Petitioner from a newspaper photograph [Doc. 8-1 p. 25-26]. Petitioner had been arrested for two murders in Kingsport, Tennessee and upon seeing his picture in the newspaper, Mr. Elbell gave a statement to a Tennessee Bureau of Investigation agent that the picture in the paper "looked a lot like" his assailant [*Id.* at 26]. Trial counsel filed a motion to suppress Mr. Elbell's identification, arguing that the procedure used in this identification was too suggestive to be reliable and that the identification itself was unreliable both because it was tentative and could have been influenced by the context of the photograph [*Id.*]. The motion to suppress was denied because the court found that there was no state action involved in the identification [Doc. 8-6 p. 53]. Trial counsel later filed a motion to reconsider the ruling on his previous motion to suppress detailing that not only was Mr. Elbell's identification unreliable, but also that after making the identification, Mr. Elbell was in the courtroom during one of Petitioner's hearings where he identified a member of the audience as his assailant, despite Petitioner's presence in the courtroom [Doc. 8-1 p. 76-79]. However, the court ordered that its ruling regarding Mr. Elbell's identification remained the same [Doc. 8-7 p. 37-38].

Given the above discussion, it appears that Mr. Elbell had no information that would have exculpated Petitioner and indeed had information, deemed admissible by the court, that may have inculpated Petitioner. Trial counsel was not then ineffective for failing to call him to testify at trial and this claim is not substantial.

### 2. Biased Juror

Petitioner claims counsel was ineffective for failing to strike or request individual voir dire of a particular juror, Juror Jones, who had been exposed to other information about Petitioner

which rendered him unacceptable as a juror and that as a result, this juror told the others about Petitioner's other pending murder case [Doc. 2 p. 17-19].

The trial court conducted an individual voir dire of Juror Jones [Doc. 8-15 p. 9]. The trial court asked Juror Jones if he had any knowledge about the case and he answered affirmatively that he had heard "something about a mistrial" in Petitioner's other case, but said that he had not formed an opinion about Petitioner's guilt or innocence or heard any facts about the other case [*Id.* at 9-10]. Counsel asked if Petitioner's involvement in the other murder cases would influence Juror Jones who responded that it would not, particularly as he did not know much due to a lengthy absence from town [*Id.* at 12].

Juror Jones was thoroughly questioned regarding his ability to remain fair and impartial and maintained that he would be able to regardless of the minimal information he had heard about Petitioner. It was reasonable for counsel to conclude based on this questioning that it was not necessary to strike Juror Jones from the jury. As to Petitioner's contention that Juror Jones later discussed Petitioner's other murder case with the other jurors, Petitioner has presented no evidence of this fact nor has he explained how trial counsel should have known about these conversations. Therefore, this claim is not substantial.

### 3. Marty Darryl Gibson

Petitioner claims that counsel had a duty to "conduct an adequate investigation, interview, and file any pretrial motion to suppress the reliability of" Mr. Gibson who testified at trial that Petitioner once told him, "I'm going to leave my mark on this place. I've already killed one person" [Doc. 2 p. 19-20]. Petitioner claims that although counsel had a duty to investigate this witness, he made no effort to inquire into Mr. Gibson's criminal background, and had counsel done so, he would have discovered that Mr. Gibson had pending charges at the time of trial [*Id.*]. In support,

Petitioner attached Mr. Gibson's judgments of convictions for drug-related offenses to his petitioner [Doc. 2-1].

However, these judgments indicate that the indictments for these charges were not filed until December 2, 2009 [*Id.* at 28-32], which was several weeks after Petitioner's October 5 trial. As such, Mr. Gibson did not have pending charges which could be used to impeach him at the time of trial and counsel cannot be deficient for failing to discover or use non-existent charges to undermine Mr. Gibson as a witness. Accordingly, there is no merit to this claim and it will not warrant an exception to the rules of procedural default.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's petition for a writ of habeas corpus [Doc. 2] will be **DENIED** and this action will be **DISMISSED**.

## V. CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the

petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

No reasonable jurist would find that Petitioner's right to speedy trial was violated, nor that Petitioner received ineffective assistance of counsel. Accordingly, a **COA SHALL NOT ISSUE.**

**IT IS SO ORDERED.**

ENTER:

_____
s/ Leon Jordan
United States District Judge